

**NUMBER 13-05-563-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ARANSAS COUNTY NAVIGATION
DISTRICT NO. 1,                                                        **Appellant,**

**v.**

**JOHN WILLIAM JOHNSON, ET AL.,**                          **Appellees.**

**On appeal from the 36th District Court of Aransas County, Texas.**

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Garza**

This is a boundary dispute between appellant, Aransas County Navigation District No. 1 (the "District"), and appellees, John William Johnson, Bobbie Jean Hoofard, and David Glen Moss, temporary administrator of the estate of Deborah Denise Johnson Gunnels (the "Johnsons"). The trial court rendered judgment on a jury verdict divesting the District of a portion of the property conveyed to it by the State of Texas in 1947, concluding that such conveyance encroached upon the Johnsons' property. By six issues, the District contends that the trial court erred. We affirm.

## I. BACKGROUND

On January 21, 1947, the State of Texas issued a patent (the "1947 Patent") which granted to the District a parcel of land situated on the western shore of Aransas Bay at the town of Fulton, Texas. The 1947 Patent described the property, which was mostly submerged under Aransas Bay, by metes and bounds. The District claims that it had requested the patent from the State to facilitate its efforts to construct a breakwater and to dredge a harbor on the subject property. The western boundary of the property ceded by the 1947 Patent lay some 320 feet east of Bay Street.[1]

Over the six decades since the 1947 Patent, the District made several improvements to the property, including the construction of a concrete bulkhead, the installation of pilings for boat slips, and the installation of electrical and water utilities for boats docked in those slips. The subject property, which was a raw shoreline in 1947, is now a developed harbor and marina.

The Johnsons own waterfront property in Fulton situated on the southwest corner of Fulton Harbor. The property owned by the Johnsons is formally described as "the Water Front east of Lots 1, 2, 3, 4, and 5 of Block 1, Fulton Townsite." It is undisputed that the property extends from Bay Street on its west side to the western shoreline of Aransas Bay on its east side. At various times since the 1947 Patent was issued, the Johnsons had either operated a marina on the shoreline property or leased the marina for others to operate.

On April 12, 1989, the District notified Hoofard that a portion of the property being used by the Johnsons as a marina belonged to the District and that the Johnsons had no lease agreement with the District that would allow such use. In 1992, John Johnson met with the Aransas County Surveyor, Jerald Brundrett, to discuss the matter. Brundrett explained to Johnson that the western boundary of the land ceded to the District according

---

[1] Bay Street in Fulton is now known as Casterline Drive. We will here refer to the street as Bay Street, which was its name as used in all depictions of the area at issue presented at trial.

to the 1947 Patent lay across a portion of the marina property. At the time, the marina was being operated by a tenant, Alby's Seafood ("Alby"), which was paying rent to both the Johnsons and the District. When Alby's lease with the Johnsons terminated on January 1, 2000, the District began charging rent directly to the owners of the boats docked at the marina.

On March 30, 2001, the Johnsons filed suit against the District seeking damages from the District as well as declaratory and injunctive relief.[2] The Johnsons claimed that they, not the District, were rightful owners of the property on which the marina was located and therefore that the District owed to them any rent payments paid to the District for use of the marina property. The District filed a first amended answer on October 29, 2003, denying the Johnsons' allegations and also asserting in the alternative a defense based upon the statute of limitations.[3]

---

[2] On July 7, 2003, the Johnsons filed a "Third Amended Petition for Declaratory Judgment & Other Relief" which added as defendants Dan Gill, Tony Dominguez, Lynn Wildman, Felix Keeley, and Doug Norrell, named both as individuals and in their official capacities as commissioners of the District. On November 18, 2003, the trial court dismissed the Johnsons' case against these defendants by written order. The Johnsons do not challenge this dismissal on appeal, and these defendants are not parties to this appeal.

Additionally, we note that, several months after the Johnsons filed their final amended petition, the Texas Supreme Court ruled that trespass to try title is the exclusive remedy for boundary disputes and that relief under the Declaratory Judgments Act is not available in such disputes. *Martin v. Amerman*, 133 S.W.3d 262, 268 (Tex. 2004). Subsequently, the Texas Legislature amended the Declaratory Judgments Act to reflect that:

> a person [interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise] may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties.

Act of Apr. 18, 2007, 80th Leg., R.S., ch. 305, § 1, 2007 TEX. SESS. LAW SERV. 583, 583 (codified at TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(c) (Vernon Supp. 2007)). The District has not raised the issue of whether the *Martin* ruling applies to this case or if the amended statute applies retroactively, and so we do not consider it here. *See* TEX. R. APP. P. 47.1; *Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.–El Paso 2007, pet. dism'd) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief.").

[3] Along with their first amended answer, the District also filed a counterclaim against the Johnsons contending that it had equitable title to the property in question. Specifically, the District alleged that:

> By written contract dated August 20, 1946, the Johnsons' predecessors in title agreed to convey to the [District] in fee simple "the Water Front East of Lots 1, 2, 3, 4 and 5 in Block 1, Townsite of Fulton, Aransas County, Texas" (hereinafter referred to as "the Waterfront Reserve") and in return, the [District] agreed to grant the Johnsons' predecessors in title a 99-year lease of the same real estate.

This counterclaim was severed by written order of the trial court dated March 18, 2004. According to the Johnsons, a final judgment was rendered in the severed case in favor of the District. The District states that

The location of the western boundary of the property granted by the 1947 Patent, defined precisely by metes and bounds in the patent document, is undisputed. Moreover, the parties agreed that the eastern boundary of the Johnsons' property was defined by the natural shoreline of Aransas Bay, without regard to any artificial alterations of the shoreline. The central issue in dispute, then, was the actual location of the natural shoreline. The Johnsons claimed that it lay to the east of the western boundary of the District's property as specified in the 1947 Patent, and therefore the 1947 Patent encroached upon the Johnsons' property. The District, on the other hand, contended that the natural shoreline was situated to the west of the western boundary of the District's property as specified in the 1947 Patent, and so there was no encroachment.

The matter proceeded to jury trial primarily on the issue of the location of the shoreline. The jury returned a verdict favorable to the Johnsons, and on June 8, 2005, the trial court rendered a judgment based upon that verdict.[4] The judgment stated in relevant part that the Johnsons "are entitled to possession and ownership of all the Waterfront east of Lots 1, 2, 3, 4, and 5 of Block 1 of Fulton Townsite." The judgment also precisely defined the property belonging to the Johnsons as encompassing the area containing the marina. The District filed a motion to correct the judgment and for new trial on July 1, 2005. The trial court denied the motion on September 8, 2005. This appeal ensued.

## II. DISCUSSION

On appeal, the District alleges that: (1) the evidence was legally and factually

---

its claim to ownership of the Johnson property as reflected in this counterclaim "is entirely separate from the District's claim based on the 1947 Patent and does not affect the issues raised in this case." In any event, neither party challenges the order of severance, and we do not consider the issue here.

[4] The record reflects that the parties stipulated that the issues of attorney's fees and damages would be submitted to the trial court and would not be an issue for the jury. Prior to the entry of the final judgment, the court denied the Johnsons' request for attorney's fees. With respect to damages, the final judgment stated:

> After the rendition of the jury's verdict, the parties stipulated that the amount of damages claimed by the [Johnsons] is exactly offset by the credit to which the [District] is entitled for the value of improvements it made in good faith to the disputed property while it was in possession.

4

insufficient to support the jury's verdict; (2) errors in the jury charge required a new trial; (3) the jury's verdict does not support the judgment; (4) the Johnsons' trial counsel asked improper questions of the prospective jurors at voir dire; (5) the trial court improperly allowed the testimony of a previously undisclosed witness; and (6) the District was entitled to submission of its claim of title by limitations.[5]

We note at the outset of our analysis that the parties do not dispute two well-settled tenets of law with regard to riparian land boundaries. First, a shoreline boundary is determined by measuring the shoreline at the mean daily high water level, or high tide.[6] Second, when a boundary is defined by a shoreline, and that shoreline moves over time, the boundary moves along with the shoreline only if the land is "gradually or imperceptibly added or taken to or from" the shore by erosion or accretion. *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex. 1976).[7] If, however, the shoreline moves seaward by means other than natural accretion, the boundary stays where it was and the riparian owner does not become owner of the new land. *See Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 414 (Tex. 1943). Further, the seaward movement of a shoreline boundary is presumed to be artificial, and the burden is placed on the riparian owner to prove otherwise. *Luttes v. State*, 324 S.W.2d 167, 187 (Tex. 1958).

## A.    Sufficiency of the Evidence

By its first issue, the District alleges that the evidence produced at trial was neither legally nor factually sufficient to support the jury's verdict. We disagree. An appellate court

---

[5] The District enumerates eight separate issues on appeal, including two regarding sufficiency of the evidence and two regarding alleged errors in the jury charge. For purposes of organization, we renumber the District's issues as six and address them as set forth above.

[6] The Texas Supreme Court has held that "shoreline boundaries in civil law land grants must be determined with reference to measured mean daily high water levels." *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 281 (Tex. 2002); *Luttes v. State*, 324 S.W.2d 167, 187 (Tex. 1958). The land grants at issue in *Luttes* and *Kenedy* were executed in the early 19th century and so Mexican or Spanish civil law regarding shoreline boundaries applied. Although neither party contends that Mexican or Spanish civil law is applicable to the land grant at issue here, they do not appear to dispute that the mean daily high water level determines the location of a natural shoreline for purposes of this case.

[7] Erosion is the process of wearing away the land; accretion is the process of gradual enlargement of the land. *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex. 1976).

will sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review, we credit evidence supporting the judgment if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827; *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 748 (Tex. App.–Corpus Christi 2006, pet. denied). More than a scintilla of evidence exists, and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001).

In conducting a factual sufficiency review, we must not merely substitute our judgment for that of the jury; rather, we view all the evidence in a neutral light to determine whether the contested finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Villagomez*, 210 S.W.3d at 749.

### 1. The Johnsons' Evidence

The Johnsons' evidence at trial centered on the testimony of Henry Warren, a licensed land surveyor. Warren had conducted a survey of the marina property and concluded that the property that was granted to the District by the 1947 Patent encroached upon the property belonging to the Johnsons. In doing so, Warren determined that the original, natural shoreline—and thus the eastern boundary of the Johnsons' property—lay to the east of the western boundary of the property ceded to the District in 1947.

The record reflects that Warren based his findings primarily upon four different

depictions of the shoreline as it existed around the time of the 1947 Patent: (1) a map made for the District in May 1947 by James Jarboe; (2) a plat made for the District in 1946 by W. A. Raatz, a District engineer; (3) a survey conducted in 1946 by the District as part of an application to construct a breakwater; and (4) a hydrographic map prepared by the U.S. Army Corps of Engineers. All four maps depicted two protrusions of land extending east of Bay Street, separated by a harbor. The Warren survey concluded, based on these maps, that the natural shoreline in that area lay to the east of both protrusions of land and the harbor, in Aransas Bay.

To explain why the natural shoreline lay not only to the east of the land, but also to the east of the harbor, Warren asserted that boat owners "kicked out" the land that originally existed where the harbor now was situated. "Kicking out," according to Warren, is a crude form of dredging whereby one would back one's boat up onto the land, and run the propellers of the boat to agitate and loosen the dirt lying underneath, leaving a rough channel. Warren testified that he had interviewed several "historical witnesses" who had described the "kicking out" process.

The Johnsons also presented testimony from three witnesses who lived in Fulton and who described the nature of the shoreline as it existed around the time of the 1947 Patent. Gene Sprinkle, a Fulton resident since his birth in 1932, testified that the land as it originally existed was "kicked out" to create the harbor and that "I have done a little bit of it [kicking out] myself." Sprinkle also testified that an oyster reef existed in 1938 south of the two protrusions of land. Gene DeForrest, born in 1930 and also a lifetime area resident, also testified regarding the oyster reef and the "kicking out" process.

Finally, the Johnsons presented the testimony of Dale Owens.[8] Owens testified that he lived for seventeen years near the Fulton waterfront, starting with the year of his birth in 1933. Owens drew a rudimentary map of the area in question as he remembered it from

_____

[8] The Johnsons' trial counsel did not list Owens as a witness in its list of fact witnesses for trial filed with the trial court. The District objected to Owens testifying as a rebuttal witness; the trial court denied the objection. This decision of the trial court, which is now being appealed by the District, will be discussed herein.

before 1947; the map was admitted into evidence. The Owens map included the two protrusions of land separated by a harbor as well as the oyster reef to the south of the protrusions. Owens testified that there were sunflowers and blackberries growing along the protrusion of land laying to the south of the harbor and that he knew this because he had "picked them [the blackberries] many times." When asked by the Johnsons' trial counsel whether or not "blueberries grow on fill," Owens responded: "Not to my knowledge." The Johnsons argued that Owens's testimony showed that the land protrusions could not have been artificial and therefore they must have been landward of the natural shoreline; i.e., part of the Johnsons' property.

### 2.    The District's Evidence

The District's trial evidence consisted of testimony from two witnesses as well as several depictions of the area that, according to the District, conclusively show that there was an artificial seaward movement of the shoreline between 1930 and 1948. First, the District presented a plat of the area at issue created in 1878 which showed the shoreline lying just to the east of Bay Street, with no substantial land masses extending into Aransas Bay. The District also introduced a 1888 map of the area that similarly showed only a small sliver of land in between Bay Street and the shoreline.

The District also presented several aerial photographs of the area to the jury. First was a photograph taken in 1930, which the District claims is the earliest known aerial photograph of the area at issue. The 1930 photograph, taken from what appears to be directly overhead, did not show Bay Street; this was because, according to the District, the street had been platted but had not yet been built. The District presented a copy of the photograph with a dotted blue line drawn in; Jerald Brundrett, the Aransas County Surveyor, testified that the blue line accurately represented the future location of Bay Street. The 1930 photograph showed only a sliver of land existing between the dotted blue line and the shoreline.

8

The District compared this 1930 photograph with another overhead aerial photograph taken in 1948. The 1948 photograph showed that Bay Street had been built by that time; it also showed the two protrusions of land extending eastward from Bay Street into Aransas Bay.[9] The District presented the comparison of 1930 and 1948 photographs to the jury in the form of a series of slides, with the latter photograph tinted blue and superimposed on the former at various levels of transparency. The first slide consisted of both photographs with the 1948 photograph being 100% transparent, so that the jury saw only the 1930 photograph; the successive slides gradually introduced the 1948 photograph at lower levels of transparency until the final slide which presented only the 1948 photograph. Brundrett testified that the direct comparison of the two photographs was appropriate because they were "geo-rectified"; that is, aligned as to scale and common geographical features. The presentation clearly showed protrusions of land in the 1948 photograph at the location where no land appeared in the 1930 photograph. The District contended that this was conclusive proof that the shoreline had moved dramatically seaward between 1930 and 1948.

Even if the jury found that the shoreline had moved, the boundary to the Johnsons' property would nevertheless move along with the shoreline if it were shown that the movement was the result of natural accretion or erosion. *See York*, 532 S.W.2d at 952; *Lorino*, 175 S.W.2d at 414. For that reason, the District argued that not only was there a clear movement in the shoreline between 1930 and 1948 as depicted in the photographs, but that this movement was too dramatic in too short a period of time to have been the result of natural accretion. Katherine Blount, a geology and environmental sciences professor at Texas A&M University–Corpus Christi, testified with reference to the 1930 and 1948 photographs that "this magnitude of change doesn't happen naturally along a fairly

---

[9] In addition to the 1930 and 1948 overhead photographs, the District introduced as evidence oblique aerial photographs of the area taken in 1946 and in 1947. Both oblique aerial photographs clearly show the protrusions of land that appeared in the 1948 overhead photograph. Because both the 1930 and 1948 photographs were taken from the same angle—that is, from directly overhead the area at issue—the District emphasized the comparison between those two photographs as evidence that the shoreline had moved.

low energy environment coastline like the Texas coast."

### 3. Analysis

The District claims that its evidence conclusively established that there was a seaward movement of the shoreline in between 1930 and 1946; moreover, it notes that the Johnsons cannot now claim that such movement was gradual or imperceptible. *See York*, 532 S.W.2d at 952. That is because the Johnsons' trial counsel explicitly foreclosed that assertion at a pre-trial hearing.[10]

However, the Johnsons do not base their argument on the assertion that there was a *natural* movement in the shoreline between 1930 and 1948 that would have caused their boundary to shift to the east. Rather, the Johnsons claim that there was no movement *at all* of the shoreline, as defined by the mean daily high tide. According to the Johnsons, to the extent the 1930 and 1948 photographs appear to show a different shoreline, this is because a channel or harbor was "kicked out" of land that already existed. The Johnsons' trial counsel emphasized that the "kicking out" process was the reason that, where there appeared to be a solid shoreline in 1930, there appeared to be a harbor in between two protrusions of land in 1946. The Johnsons' counsel essentially asked the jury to disregard

---

[10] Specifically, the District propounded an interrogatory to the Johnsons asking the following: "Do you contend that the portion of the 1947 patent property which you claim to own was landward of the line of mean high water as it existed in 1930? If so, state the complete factual basis for that contention." The Johnsons responded by objecting to the interrogatory and stating: "All of the Johnsons' Fulton Beach Marina property was and continues to be above mean high water." The District then moved to compel the Johnsons' answer.

The Johnsons' position was clarified in the following exchange between the Johnsons' counsel and the trial court at a subsequent pre-trial hearing:

[Johnsons' counsel]: [W]ith respect to just whether we think the land was there, the land was always there. And there has been no – the land was never below mean high tide, and so there was no accretion necessary to make it above mean high tide.

THE COURT: [Addressing District's counsel] All right. If I understand his answer to your interrogatory in which what you're wanting to know is are they making a claim here today that there has been some kind of accretion regarding the shoreline that would basically go to their benefit, you've already discussed in your particular synopsis to the Court. And you want to know whether they're claiming that the boundary changed, if you would, by accretion, and they're saying no.

[Addressing Johnsons' counsel] Is that correct, Mr. Conoly?

[Johnsons' counsel]: That's correct.

10

the photographic comparison, which, if taken as accurate, "geo-rectified" depictions of the natural shoreline at the relevant times, showed that land had been added over those sixteen years rather than taken away.

The District contends that the jury was not free to disregard the photographic comparison, which they consider to be conclusive proof that a seaward movement of the shoreline in fact did occur. However, the jury was not obliged to believe that the 1930 photograph accurately depicted the mean daily high water level of Aransas Bay. Although the photographs of the shoreline are probative when viewed together, they do not conclusively establish that Warren's testimony regarding the boundary of the Johnsons' property was incorrect. *See City of Keller,* 168 S.W.3d at 810. Although it may appear to the District that the jury's discounting of the photographic comparison was unreasonable, the jury was not required to believe that evidence any more than they were required to believe the testimony of any particular witness. *See id.* at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another."). Indeed, Warren testified as follows:

> [F]or a photo to be significant in the determination of the shore, you have to know the day, you have to know the time and you have to know the elevation of the water as shown by tide gages, and then you can use it to determine where the shore is.

The District did not present any evidence as to the time of day or year when the 1930 photograph was taken. Warren's testimony therefore provided a reasonable basis for the jury to conclude that the 1930 photograph did not accurately depict the natural shoreline as defined by the mean daily high water level.

Moreover, Sprinkle testified that he recalled fishing for flounder on land now claimed by the District, as early as 1938. According to the Johnsons, this testimony indicated that the marina property was to the west of the natural shoreline. Although the District may consider dubious the testimony of a 72-year-old man regarding his experiences as a six-year-old, as in Sprinkle's case, the jury clearly did not. A reviewing court cannot substitute

11

its judgment for that of the trier of fact, so long as the evidence falls within a zone of reasonable disagreement. *Id.* at 822.

We conclude that the evidence furnished a reasonable basis for the contention that Warren's survey properly located the natural shoreline defining the boundary of the Johnsons' property. As such, there was more than a scintilla of evidence to support that finding. *See Harrison*, 70 S.W.3d at 782-83. The evidence did not conclusively establish that Warren's survey was incorrect. *See City of Keller,* 168 S.W.3d at 810. Additionally, viewing the evidence in a neutral light, we cannot conclude that the jury's conclusion was so contrary to the preponderance of the evidence as to be manifestly unjust or shock the conscience. *See Jackson*, 116 S.W.3d at 761. Therefore, the evidence presented at trial by the Johnsons was legally and factually sufficient to support the jury's verdict. Accordingly, the District's first issue is overruled.

## B.      Jury Charge

By its second issue, the District contends that the charge submitted to the jury was fatally defective in two ways, and that a new trial is therefore required. First, the District contends that the jury charge was improper because it asked the jury whether the Warren survey was "substantially correct." The second error alleged by the District with respect to the jury charge is that the trial court did not include an instruction on the law regarding a seaward movement of a boundary shoreline.

Texas Rule of Civil Procedure 278 requires the trial court to submit instructions and definitions to the jury as are necessary to enable the jury to render a verdict. TEX. R. CIV. P. 278. The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). Failure to submit a question is not deemed grounds for reversing the judgment unless its submission, in substantially correct wording, has been requested in writing by the party complaining of the judgment. TEX. R. CIV. P. 278. As long

12

as the charge is legally correct, trial courts are afforded broad discretion, subject to reversal only on a court's abuse of that discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Hagins v. E-Z Mart Stores, Inc.*, 128 S.W.3d 383 , 387 (Tex. App.–Texarkana 2004, no pet.). Even if the trial court abused its discretion, we reverse only where the error in the jury charge is shown to be harmful. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749-50 (Tex. 1980). Moreover, a jury charge error is reversible only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1(a).

### 1. "Substantially Correct"

Question number one of the jury charge read as follows: "Do you find from a preponderance of the evidence that the survey prepared by Harry Warren in July of 2003 is a substantially correct description of the natural shoreline?"[11] The jury answered in the affirmative. At trial, the District objected to the inclusion of this question, claiming that "the modifier 'substantially' allowed the jury completely unguided discretion about how close the Warren survey had to be to the actual natural shoreline in order to be 'substantially' correct." The District now contends that the inclusion of this question was error because "the word 'substantially' could be interpreted by the jury as requiring accuracy to within inches, feet, or hundreds of yards." The Johnsons, on the other hand, contend that the phrase "substantially correct" has an ordinary meaning of "truly or really accurate"[12] and that the jury could not have been asked to define the boundary to any more demanding standard of accuracy.

---

[11] The jury charge instructed the jury to answer "yes" or "no" to question number one, and then to answer question number two only if the answer to question number one was "no." Question number two read:

> Do you find from a preponderance of the evidence that the western boundary line of the November 1946 patent survey prepared by James Jarboe is at or to the east of the natural shoreline in the area of the "Johnson property" in dispute?

Because the jury answered "yes" to question number one, no answer was given to this second question.

[12] "Substantial" is synonymous with "real" and "true"; "correct" with "accurate" and "exact." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 260, 1174 (10th ed. 1996).

13

In a boundary dispute, the ultimate object of the trier of fact is to determine the "true location of the line in dispute." *Mortgage Inv. Co. of El Paso v. Bauer*, 493 S.W.2d 339, 342 (Tex. Civ. App.–El Paso 1973, writ ref'd n.r.e.), *overruled on other grounds*, *Martin v. Amerman*, 133 S.W.3d 262, 268 (Tex. 2004). Moreover,

> [w]hen this cannot be done with reasonable certainty due to the lapse of time or the obliteration of the evidence of the original locater, it is not only permissible, but, out of necessity, required that the courts resort to any evidence tending to establish the place of the original footsteps of the surveyor which meet the requirement that it is the best evidence of which the case is susceptible.

*Bauer*, 493 S.W.2d at 342. In other words, where "exactness [is] difficult of attainment, [it] should not be insisted upon, to the destruction of right." *State v. Humble Oil & Ref. Co.*, 187 S.W.2d 93, 107 (Tex. Civ. App.–Waco 1945, writ ref'd w.o.m.) (citing *Hamilton v. Menifee*, 11 Tex. 718, 749 (1854)).

Although the parties do not direct us to, nor can we find, any Texas case interpreting the phrase "substantially correct" as used in a boundary dispute jury charge, courts have clarified the phrase in other contexts. In fact, as noted above, Texas Rule of Civil Procedure 278 provides that a trial court's failure to submit an issue shall not be grounds for reversal of the judgment unless the issue was previously tendered by the appellant in "substantially correct" wording. TEX. R. CIV. P. 278. In that context, the Texas Supreme Court has stated that:

> Substantially correct . . . does not mean that it must be absolutely correct, nor does it mean one that is merely sufficient to call the matter to the attention of the court will suffice. It means *one that in substance and in the main is correct, and that is not affirmatively incorrect*.

*Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987) (citing *Modica v. Howard*, 161 S.W.2d 1093, 1094 (Tex. Civ. App.–Beaumont 1942, no writ)) (emphasis added). If the phrase "substantially correct" were given the same meaning in the present context, question number one of the jury charge would be sufficient to determine the "true location" of the boundary in dispute. *See Bauer*, 493 S.W.2d at 342.

14

We conclude that the trial court did not abuse its discretion by including in the jury charge a question of whether the Warren survey was "substantially accurate."

## 2.     Instruction on Effect of Seaward Movement of Shoreline Boundary

The District also challenges the trial court's decision not to include an instruction on the law regarding the movement of shoreline boundaries. In their Requested Jury Question No. 1, the District included the following sentence: "You are instructed that a seaward movement of a shoreline is presumed to be artificial unless it is proven to have been gradual, natural, and imperceptible." The trial court declined to include this instruction in the jury charge. The District now contends that this decision was an abuse of discretion, claiming that without the instruction, the jury was free to find an artificial seaward movement of the shoreline and still find in favor of the Johnsons. In response, the Johnsons state that the inclusion of the District's proposed instruction would have impermissibly "commented on the weight of the evidence." *See Associated Carriages, Inc. v. Int'l Bank of Commerce*, 37 S.W.3d 69, 75 (Tex. App.–San Antonio 2000, pet. denied). The Johnsons also contend that the instruction was unnecessary and would have improperly "tilt[ed]" or "nudge[d]" the jury. *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723-24 (Tex. 2003).

Without passing on the validity of the Johnsons' contentions, we note that the District's proposed instruction was not an accurate description of the law pertaining to the movement of shoreline boundaries. The supreme court has stated that "[t]he general rule is that a riparian or littoral owner acquires or loses title to the land gradually *or* imperceptibly added or taken to or from his fast bank or shore." *York*, 532 S.W.2d at 952 (emphasis added). The District's proposed instruction, however, stated that a seaward movement is presumed to be artificial unless it is "gradual, natural, *and* imperceptible" (emphasis added). The difference is not negligible. Had the District's proposed instruction been included, the jury could have found that there was a gradual and natural seaward

15

movement of the shoreline, and yet if the movement was perceptible, the jury would have incorrectly concluded that the boundary did not move with the shoreline.

We conclude that the trial court did not abuse its discretion in its formulation of question number one of the jury charge because the District failed to submit its requested instruction in substantially correct wording. *See* TEX. R. CIV. P. 278. The District's second issue is therefore overruled.

## C.     Verdict Support for the Judgment

The District asserts, by its third issue, that the jury verdict did not support the judgment issued by the trial court. Specifically, the District contends that the trial court improperly included in its judgment a precise description of the boundaries of the Johnsons' property adopted from the Warren survey, even though the jury merely found that the Warren survey was "substantially correct." In accordance with our conclusion above that the "substantially correct" wording was sufficient to establish the true location of the boundary in dispute, we find that the jury verdict provided sufficient support for the court's final judgment precisely defining that boundary. The District's third issue is overruled.

## D.     Voir Dire Examination

By its fourth issue, the District claims that it was unfairly prejudiced by questions asked at voir dire by the Johnsons' trial counsel. The following exchange between the attorneys and the trial court illustrates the dispute:

[Johnsons' counsel]:  How would it make you feel if land had been in your family five years, ten years, 50 or 60 like the Johnsons –

[District's counsel]:  Excuse me, your Honor. I'm going to –

[Johnsons' counsel]:  – and somebody –

[District's counsel]:  Excuse me, counsel. I'm sorry to interrupt. I am going to object to this question as asking the jury to place themselves in a position of one side of the case and ask – improper presenting the case.

16

THE COURT: I haven't really heard the full question as to where he is going with it. I'll sustain as to that regard. Rephrase your question, please, Mr. Casterline [Johnsons' counsel].

[Johnsons' counsel]: How would it make you feel if someone came up to you and said you think that is your land? It's my land. Get off. How would it make you feel?

[District's counsel]: Your Honor, that is the question, and that is what I'm objecting to.

THE COURT: Okay. I will sustain that.

[Johnsons' counsel]: May we approach, your Honor?

THE COURT: You may.

*(Off-the-record discussion at the bench)*[13]

[Johnsons' counsel]: Let me start here on the first row. How would it make you feel, sir, if land in your family for years was suddenly in jeopardy? Someone told you, hey, that is my land. I am going to take it away from you. Tell me how that would make you feel.

The District states that the trial court abused its discretion in permitting the Johnsons' counsel to ask these questions, citing two cases where courts found it to be improper for counsel at closing argument to ask a juror to place himself in the position of the plaintiff. *See Fambrough v. Wagley*, 169 S.W.2d 478, 480-82 (Tex. 1943); *S. Pac. Co. v. Hayes*, 391 S.W.2d 463, 468-69 (Tex. Civ. App.–Corpus Christi 1965, writ ref'd n.r.e.). The District claims that "there is no apparent reason for applying a different rule to the voir dire examination of the jury panel." We disagree.

The Texas Supreme Court has recognized that "trial courts should allow broad latitude to counsel" at voir dire examination "to discover any bias or prejudice by the potential jurors so that peremptory challenges may be intelligently exercised." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006) (internal quotations omitted); *see*

_____

[13] During this bench conference, the trial court reversed its earlier ruling and overruled the objections made by the District's counsel as to the questions asked by the Johnsons' counsel.

17

*also Green v. Ligon*, 190 S.W.2d 742 (Tex. Civ. App.–Fort Worth 1945, writ ref'd n.r.e.) (stating that "our courts have been very liberal in permitting a broad range of inquiries on voir dire to enable counsel to intelligently use their peremptory challenges"). The scope of such examination rests largely in the sound discretion of the trial court. *Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 709 (Tex. 1989). To obtain a reversal, an appellant must show that the trial court abused its discretion and that the error was calculated to cause and probably did cause the rendition of an improper judgment. TEX. R. APP. P. 44.1; *Babcock*, 767 S.W.2d at 709.

In *Hyundai Motor Co.*, the supreme court emphasized that the trial court is in the best position to determine whether a voir dire question is proper:

> The Texas Constitution guarantees a trial by a fair and impartial jury, and our courts use voir dire to achieve that goal. Voir dire inquiries that explore external biases and unfair prejudices further the effort, but those that test jurors' possible verdicts based on case-specific relevant evidence detract from it. The distinction between the two in some cases is a fine one. Thus, we vest trial judges with the discretion to decide whether an inquiry constitutes the former or the latter; as appellate courts, we should defer to their judgment.

189 S.W.3d at 760.

Here, the Johnsons contend that their counsel's voir dire questions were intended to solicit the potential jurors' honest opinions and values regarding the subject matter of the dispute. A voir dire examination need not be confined to matters which might be grounds for challenge for cause. *Greenman v. City of Fort Worth*, 308 S.W.2d 553, 554 (Tex. Civ. App.–Fort Worth 1957, writ ref'd n.r.e.). Deferring to the trial court's superior ability to determine the reasonableness of a voir dire question under the circumstances, *see Hyundai Motor Co.*, 189 S.W.3d at 755, we cannot say that the trial court abused its discretion here. Accordingly, the District's fourth issue is overruled.

## E.    Testimony of Dale Owens

By its fifth issue, the District contends that the trial court improperly permitted the Johnsons to call Dale Owens, who had not been previously disclosed to the District, as a

rebuttal witness at trial.

Texas Rule of Civil Procedure 193.6(a) provides that a party who fails to timely make, amend, or supplement a discovery response may not introduce in evidence the undisclosed material or unidentified witness unless the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a). The burden of showing good cause, or lack of unfair surprise or unfair prejudice, is on the party seeking to introduce in evidence the undisclosed material or unidentified witness. TEX. R. CIV. P. 193.6(b). Further, a finding of good cause or lack of unfair surprise or unfair prejudice must be supported by the record. *Id.*

The District contends that it was unfairly surprised and prejudiced by Owens's testimony regarding his picking blackberries as a child on the protrusions of land extending into Aransas Bay.[14] The District's trial counsel, however, in objecting to Owens's testifying, admitted to the trial court that Owens was "just another historical witness" whose testimony was "just a cumulation of [the Johnsons'] case in chief." The admission of evidence that is merely cumulative, and not dispositive of the case, is not reversible even if in error. *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989) (stating that "[t]his court will ordinarily not find reversible error for erroneous rulings on admissibility of evidence where the evidence in question is cumulative and not controlling on a material issue dispositive of the case"). Although the District's counsel asserts on appeal that he was misquoted in calling Owens's testimony a "cumulation," the District has not made a request to this Court or to the trial court that the reporter's record be corrected. *See* TEX. R. APP. P. 34.6(e)(2) (requiring the trial court to settle disputes regarding alleged inaccuracies in

---

[14] The District also contends that the Johnsons made a pre-trial tactical decision to classify Owens as a rebuttal witness so that they would not need to disclose his identity. This would be an impermissible end run around the procedural rule requiring disclosure. *See Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 917 (Tex. 1992). Other than the District's bald allegations, however, the record is devoid of any indication that the Johnsons in fact did make such a pre-trial tactical decision.

reporter's record), 34.6(e)(3) (providing that the appellate court may submit to the trial court any post-appeal disputes as to alleged inaccuracies in reporter's record).

In any case, our review of the record reveals that Owens's testimony was indeed cumulative of the prior evidence introduced by the Johnsons. Owens' testimony simply bolstered the Johnsons' theory that the protrusions of land as shown in the 1946 photograph were natural because blackberries had grown there. Warren, the Johnsons' expert witness in their case in chief, testified that he had interviewed Owens and that "[Owens] told me that this land had always been there, that it even had blackberries on it. They use[d] to come down and pick blackberries on that piece of land." The District objected to Warren's testimony regarding Owens's statement as hearsay, but that objection was overruled by the trial court. Further, the trial court's decision to overrule that objection is not challenged by the District on appeal.

We conclude that Owens's testimony was merely cumulative of the Johnsons' case in chief. Therefore, even if we were to agree with the District that the Johnsons failed to meet their burden under rule of civil procedure 193.6, any error committed by the trial court in permitting Owens's testimony was harmless. *See* TEX R. CIV. P. 193.6; *Gee*, 765 S.W.2d at 396. The District's fifth issue is overruled. *See* TEX. R. APP. P. 44.1(a)(1).

## F.    District's Claim of Title by Limitations

The District's sixth issue on appeal concerns the trial court's decision not to include questions in the jury charge as to the District's claim of adverse possession to the property in dispute under both the three-year and five-year statutes of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.024, 16.025 (Vernon 2002).

Texas Rule of Civil Procedure 278 provides a substantive, non-discretionary directive to trial courts requiring them to submit requested questions to the jury if the pleadings and any evidence support them. TEX. R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1993). That is, a trial court may refuse to submit an issue only if

20

no evidence exists to warrant its submission. *Elbaor*, 845 S.W.2d at 243 (citing *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985)). Failure to submit a question is not deemed grounds for reversing the judgment unless its submission, in substantially correct wording, has been requested in writing by the party complaining of the judgment. *Id*. A claim that the evidence was legally or factually insufficient to warrant the submission of a question may be made for the first time after the verdict, regardless of whether the submission of such question was requested by the complainant. TEX. R. CIV. P. 279.

Here, the District submitted the following Requested Jury Question No. 2:

Do you find that, for more than three years before March 30, 2001, the Navigation District held the property in dispute under title and the Navigation District, or one or more persons leasing from it, were in peaceable and adverse possession of any portion of the property in dispute?

The District also submitted the following Requested Jury Question No. 3:

Do you find that, for more than five years before March 30, 2001, the Navigation District claimed the property in question under a duly registered deed and that the Navigation District or one or more persons leasing from the Navigation District, were in peaceable and adverse possession of any portion of the property and used or enjoyed it?

Both jury questions requested by the District included a definition of "adverse possession" as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."[15]

To establish its entitlement to a jury question as to the three-year statute of limitations, the District was required to present evidence that it possessed the land in dispute peaceably and adversely under title or color of title for at least three years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.024. To establish its entitlement to a jury question as to the five-year statute, the District was required to present evidence that it cultivated, used, or enjoyed the land peaceably and adversely under a duly registered deed while paying applicable taxes, for at least five years. *Id.* § 16.025.

---

[15] The District's Requested Jury Question No. 2 also included a definition of "title" as "a regular chain of transfers of real property from or under the State of Texas" and a definition of "peaceable possession" as "possession of real property that is continuous and is not interrupted by an adverse suit to recover the property."

21

Our review of the record reveals no evidence indicating that the District exclusively occupied the property claimed by the Johnsons. The District notes that "[f]rom about 1992 to 2000, the District was charging rent to the Johnsons' tenant for the portion of the marina property that lay within the patent boundaries."[16] However, joint or common possession by the adverse possession claimant and the owner defeats the requisite quality of exclusiveness. *Turner v. Mullins*, 162 S.W.3d 356, 367 (Tex. App.–Fort Worth 2005, no pet.); *West End API, Ltd. v. Rothpletz*, 732 S.W.2d 371 (Tex. App.–Dallas 1987, writ ref'd n.r.e.); *see Rick v. Grubbs*, 214 S.W.2d 925, 927 (Tex. 1948). Moreover, proof that the owner's tenant is in possession at the same time as the claimant is not sufficient to sustain a claim of adverse possession. *Solis v. La Brisa Land & Cattle Co.*, 361 S.W.2d 631, 632 (Tex. App.–San Antonio 1962, no writ) (citing *Rick*, 214 S.W.2d at 927).

The allegations that the District charged rent to tenants of the Johnsons was insufficient to establish exclusive possession by the District, which is a required element under both statutes of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.024, 16.025. We therefore conclude that the trial court did not err in declining to include questions in the jury charge as to the District's claim of adverse possession under those statutes. *See* TEX. R. CIV. P. 278; *see also Elbaor*, 845 S.W.2d at 243 (holding that a trial court may refuse to submit an issue in a jury charge if there is no evidence to warrant its submission). The District's sixth issue is overruled.

---

[16] The District also contends that "[a]fter January 1, 2000, when the Johnsons' lease with Alby terminated, the District was charging rent directly to the boat owners for the use of the boat slips that the District had built." The District urges that this was sufficient evidence to establish their entitlement to the submission of a jury question on adverse possession, citing *McShan v. Pitts*, 554 S.W.2d 759, 763 (Tex. Civ. App.–San Antonio 1977, no writ), for the proposition that an adverse possession claimant can meet the exclusivity element if his tenant occupied the disputed land. Without determining whether this allegation is in fact sufficient to establish exclusive possession, we note that the duration of time during which the District claims to have been "directly" charging rent to boat owners was too brief to sustain a defense under either statute of limitations—only 15 months passed between January 1, 2000 and March 30, 2001, the date the Johnsons filed suit. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.024, 16.025 (Vernon Supp. 2007).

### III. Conclusion

Having overruled the District's six issues, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this the 29th day of April, 2008.